## AFFIDAVIT

I, J. Brooks Broadus, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state as follows:

### Introduction

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since February 11, 2001. During my career, I have conducted numerous investigations into racketeering, drug and firearm trafficking, human trafficking, human smuggling, domestic and international terrorism, and to possess weapons of mass destruction. I am currently assigned to the Child Exploitation and Human Trafficking Task Force, which investigates the exploitation of children, as well as the trafficking of individuals within and from outside the United States. I have received extensive training in the area of federal criminal and constitutional law and evidence collection. I am a graduate of The University of South Alabama where I received my bachelors of science in nursing and of Indiana University of Pennsylvania where I received my master's degree in criminology. Prior to my current employment I was a Registered Nurse in an emergency department.

2.  From my training and experience, I know that individuals are trafficked for several purposes. Some of these purposes are subjection into involuntary servitude, peonage, debt bondage and slavery. Human trafficking is often accomplished through the use of fraud, force and coercion. I am familiar with the federal and state laws which make it a violation to engage in human trafficking, such as 18 U.S.C. §§ 1581 through 1595 (Peonage, Slavery and Trafficking in Persons), 18 U.S.C. §§ 2421 through 2428 (Transportation for Illegal Sexual Activity and Related Crimes), 18 U.S.C. §§ 1512 (Tampering with a witness, victim, or an informant) and Massachusetts General Laws Chapter 272 related to the Prostitution industry.

As a federal agent, affiant is authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

3. I am submitting this affidavit in support of an application for a criminal complaint charging that, from on or about February 9, 2015 through February 23, 2015, in the District of Massachusetts and elsewhere

**(1) TYRELL GORHAM, a/k/a "Sheek;"**
**(2) LEE YOUNG, a/k/a "Chop;" and**
**(3) CHELANJEI GREENE, a/k/a "Young"**

in and affecting interstate and foreign commerce, and aiding and abetting each other engaged in sex trafficking through force, fraud, or coercion and engaged in sex trafficking of a minor through force, fraud, or coercion in violation of Title 18, United States Code, Sections 1951(a)(1), and 2. Further, I am submitting this affidavit in support of an application for a criminal complaint charging that on or about February 22, 2015, in the District of Massachusetts and elsewhere

**(1) TYRELL GORHAM, a/k/a "Sheek;" and**
**(2) LEE YOUNG, a/k/a "Chop"**

in at least two federal districts, including the District of Massachusetts, did knowingly transport Minor A, who was under the age of eighteen, in interstate commerce from Maine to Massachusetts with the intent that Minor A engage in prostitution and in sexual activity for which any person can be charged with a criminal offense in violation of Title 18, United States Code, Section 2423.

## BACKGROUND OF THE INVESTIGATION

4. On February 23, 2015, law enforcement officers from the FBI, the Massachusetts State Police (MSP), the Revere Police Department (RPD) and the Woburn Police Department (WPD) conducted proactive law enforcement operations in the Boston Massachusetts

metropolitan area. The online forum for escorts within Backpage.com was used to locate possible underage victims of sex trafficking in the Boston area. As a result of this investigation members of my Task Force and I interviewed four females, referred to herein as Minor A, Woman A, Woman B, and Woman C, who identified GORHAM, YOUNG and GREENE as individuals who engage in sex trafficking, and persuade, induce, entice, and coerce individuals, including a minor, to travel in interstate commerce to engage in prostitution in the Greater Boston Area. This information is summarized below.

    *(i)*    <u>Minor A</u>

5. On February 23, 2015, Minor A was interviewed after agreeing to provide an undercover law enforcement officer with sex in exchange for money and recounted the following set of facts: On or about February 16, 2015 Minor A, who was 17 years old and lived in Maine at the time, told GORHAM that she wanted to run away. GORHAM told Minor A that she was "sixteen" and "you know what you will be doing if you leave with me." Minor A told GORHAM "I know" and took that to mean that she would be "prostituting herself." GORHAM had approached Minor A about engaging in sex trafficking approximately one year earlier to help "get her out of Maine." GORHAM told Minor A that she would receive $1500.00 a week and "they pay for all the expenses during the week." On February 22, 2015, at a proximately 8:00 p.m., GORHAM and YOUNG, also known as "Chop" picked up Minor A and her friend, referred to herein as Woman A, in a silver Ford in front of Scotty's Variety in Waterville, Maine and drove out of state to Massachusetts. During the trip GORHAM received numerous incoming calls on his cellular telephone from two women known to Minor A and referred to herein as Woman B and Woman C.

6.     GORHAM, YOUNG, Minor A, and Woman A drove to the Red Roof Inn, located at 920 Broadway Street, Saugus, Massachusetts where they met up with Woman B and Woman C. Minor A and Woman A shared a room that night. GORAHM, YOUNG, Woman B, and Woman C shared a separate room. At approximately 7:00 a.m. the following morning, February 23, 2015, an employee of the Red Roof Inn woke Minor A and Woman A and told them that they would have to leave the room because it smelled of marijuana. Minor A and Woman A went to the lobby of the Red Roof Inn and met up with GORHAM and YOUNG. GORHAM and YOUNG drove Minor A and Woman A to Chelsea, Massachusetts and left them at the house of an unidentified female who left the residence with GORHAM and YOUNG.

7.     YOUNG returned alone awhile later and drove Minor A and Woman A to GREENE's house located at 57 Keith Avenue, Brockton, Massachusetts. Before dropping Minor A and Woman A off, YOUNG told Minor A not to tell GREENE that she was a minor. Once inside 57 Keith Avenue, GREENE asked Minor A and Woman A if they had a Backpage "post" and then used Minor A's cellular telephone to post an "ad" depicting scantily clad photographs of Minor A and Woman A to Backpage account ID 29018699 entitled "New in town 2 girl special – 19."

8.     YOUNG returned to GREENE's residence, picked up GREENE, Minor A and Woman A and drove to the Best Western Plus Roundhouse Suites, Boston, Massachusetts and rented room 211 under the name "Lee YOUNG, 57 Keith Avenue, Brockton, Massachusetts. Once in the room Minor A and Woman A took turns showering. Once Minor A and Woman A were dressed GREENE came to the room and stated "Tyrell" is not answering his phone and that something must "be wrong." Minor A received a call on a cellular telephone in response to the

Backpage post. The caller was looking for a "date" and arranged to meet Minor A and Woman A in a hotel in Woburn, Massachusetts.

9. Minor A and Woman A drove themselves to the Comfort Inn, located at 14 Hill Street, Woburn, Massachusetts. Once in the parking lot both Minor A and Woman A became nervous over the idea of following through with the "date" because they had never engaged in prostitution before. Approximately twenty minutes later Minor A and Woman A went to room 312 of the Comfort Inn and met their "date." Once inside the room Minor A and Woman A received $300 from the "date," took their clothes off, and began to engage in sexual activity with one another.

10. The "date," an undercover officer, alerted nearby members of the investigative team and identified himself to Minor A and Woman A. Minor A and Woman A got dressed and were interviewed separately by law enforcement.

(ii)     *Woman A*

11. On February 23, 2015, Woman A was interviewed after agreeing to provide an undercover law enforcement officer with sex in exchange for money and recounted the following set of facts: Woman A has known Minor A for approximately five years. Woman A and Minor A met on the streets of Maine. Woman A met GORHAM through Minor A and said GORHAM was Minor A's "brother" who had known Minor A since Minor A was "in diapers." Woman A knew that GORHAM "prostitutes girls." GORHAM told Woman A if she worked for him as a prostitute GORHAM would pay her $1500.00 every Saturday. GORHAM explained to Woman A that he would keep all of the money she made as a prostitute and he would give her everything she needed and pay for the hotels and asked her, "you know what you have to do?" Woman A took this to mean that she would have to engage in various sexual activities and agreed.

5

12.     On February 22, 2015, between approximately 8:30 p.m. and 9:00 p.m. GORHAM and YOUNG, who Woman A called "Chop," picked up Woman A and Minor A in Maine and drove them out of state to the Red Roof Inn in Saugus, Massachusetts.  Once inside the Red Roof Inn Woman A met Woman B and Woman C.  Woman C gave Woman A and Minor A a key card to a "free room."  Minor A and Woman A stayed in the "free room" at the Red Roof Inn.  According to Woman A, GORHAM, YOUNG, Woman B, and Woman C stayed in a different room.  At the hotel GORHAM instructed Minor A and Woman A on how to post an ad on Backpage with a Tracfone that either GORHAM or YOUNG gave Minor A and Woman A to use for the purpose of engaging in prostitution.  Woman A paid for the ad with a prepaid card from Rite Aid given to Woman A by GORHAM.

13.     The following day GORHAM and YOUNG drove Woman A and Minor A to a unidentified female's house known only as "M."  "M" left the residence with GORHAM and YOUNG.  Woman A and Minor A took a nap in "M's" bedroom.  YOUNG returned later with a different rental car.  YOUNG, Woman A and Minor A drove to GREENE's residence located at 57 Keith Avenue, Brockton, Massachusetts where YOUNG dropped Minor A and Woman A off.

14.     Once in the residence GREENE advised Woman A and Minor A on how to conduct themselves as prostitutes.  GREENE instructed Woman A and Minor A on how not to get caught.  YOUNG returned and picked up GREENE, Woman A, and Minor A then drove them to the Best Western Plus Roundhouse Suites, Boston, Massachuetts.  Woman A and Minor A showered in room 211.  Woman A and Minor A received approximately 10 responses via cellular telephone to their Backpage ad.

15.     Woman A and Minor A asked YOUNG and GREENE if they should go on one of the "dates."  Woman A and Minor A were advised to go on the "date" and told by YOUNG and

6

GREEN to "dress like a girl," "flaunt yourselves," and "you have to want money in order to get money." Woman A and Minor A drove to Woburn to meet one of the "dates," calling YOUNG when they arrived in the parking lot of the hotel. Once inside the room Minor A and Woman A received $300 from the "date," took their clothes off, and began to engage in sexual activity with one another. Law enforcement officers entered the room and Woman A and Minor A were separated and interviewed.

    (iii)    <u>Woman B</u>

16.    On February 23, 2015 Woman B was interviewed and recounted the following set of facts: During the week of February 9, 2015, Woman B acquired a new "Facebook friend" called "Daddy." "Daddy" was later identified as GORHAM. During the week of February 16, 2015, Woman B drove in her car from Maine out of state to "Boston" to meet "Daddy" and agreed to "work for him." Woman B did not understand the "conditions" she would have to endure at the time she agreed to "work."

17.    GORHAM drove Woman B to 57 Keith Avenue, Brockton, Massachusetts where Woman B parked her car. GORHAM took the car keys from Woman B. GORHAM posted an ad for Woman B on Backpage. GORHAM drove Woman B to the Red Roof Inn in Saugus where Woman B met a woman referred to herein as Woman C.

18.    For the next six days or so GORHAM "demanded" that Woman B go on 10-15 "dates" per day where she would engage in various sexual activity in exchange for money. When Woman B failed to keep up with that demand GORHAM would become angry and verbally abusive towards Woman B. Woman B was never physically assaulted by GORHAM, but was scared of him because he told her that he had a "murder charge on him." GORHAM provided Woman B and Woman C with heroin so that they could stay awake and perform the

7

required number of "dates." GORHAM had sex with Woman B who assumed she had no choice other than to sleep with him.

19. GORHAM instructed Woman B to charge a customer $100 for 15 minutes of sex, $150.00 for 30 minutes of sex, and $200.00 for one hour of sex. GORHAM told Woman B that if both Woman B and Woman C were requested for a "date" she was to charge an additional $200.00. GORHAM told Woman B to perform any sex act the customer requested, to include unprotected sex, but that she "better get paid for it." GORHAM took all of Woman B's money in the six day period. GORHAM drove Woman B and Woman C to all "dates" returning later to pick them up. GORHAM kept the keys to the vehicle at all times so Woman B had no access to the vehicle. Woman B was given very little food during the six day time period.

20. On February 23, 2015, Woman B and Woman C arrived at the Fairfield Inn and Suites, Marriott, 100 Morris Street, Revere, Massachusetts to meet a "date" who responded to a Backpage posting. Once Woman B and Woman C were in the room the "date," an undercover officer, alerted nearby members of his investigative team, identified himself to Woman B and Woman C as the team entered the room. Woman B and Woman C were interviewed by law enforcement separately.

## ARREST OF TYRELL GORHAM

21. Law enforcement officers conducting physical surveillance of the Fairfield Inn on February 23, 2015, observed GORHAM drop Woman B and Woman C off. After being identified as Woman B's pimp GORHAM was placed under arrest when he returned to pick up Woman B and Woman C from their "date." Although GORHAM has been in custody on state human trafficking charges since February 23, 2015, Minor A, Woman A and Woman B have reported to me that they have received threatening communications from a Facebook used by

GORHAM.

22. On March 31, 2015, I reviewed telephone calls obtained via subpoena from the Nashua Street Jail. The calls are recorded pursuant to jail policy and the callers are automatically notified of that fact prior to each conversation. During the calls GORHAM told a female, later identified as Shanea Bloomquist, that his "sign in" is "devontemalia@gmail.com" and his password was "paytonGORHAMA." During a later call Bloomquist told GORHAM that she had sent all of Woman B's photographs to and individual that I know to be Woman B's boyfriend. I believe that this was done in an attempt to keep Woman B from cooperating with law enforcement. In addition, GORHAM stated that the "girls should have said [GORHAM] was their driver" and not their "P." I believe that "P" used in this context stands for pimp. I believe that "the girls" are Woman B and Woman C. GORHAM also laughed and stated that he told "them" that he would pay "them" every Saturday, but "Saturday never came!" GORHAM also told Bloomquist "I left Chop with two able bodied girls who are willing to work" and inquired as to why YOUNG had not sent GORHAM money while he was in custody. Bloomquist told GORHAM that "they got [Minor A] and [Woman A]. GORHAM asked Boomquist why "Chop" wasn't also in custody then. Bloomquist had no answer, but told GORHAM that she had two "girls" she could put to work to raise money for him.

## CONCLUSION

Based on the above, I believe that probable cause exists to conclude that **GORHAM**, **YOUNG**, and **GREENE** in and affecting interstate and foreign commerce, and aiding and abetting each other, recruited, enticed, harbored, transported, provided, obtained, and maintained by any means, and benefited, financially and by receiving anything of value, from participation in a venture which recruited, enticed, harbored, transported, provided, obtained, and maintained Minor A, Woman A, and Woman B knowing and in reckless disregard of the fact that force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause Minor A, Woman A, and Woman B to engage in a commercial sex act, and that Minor A had not attained the age of 18 years and would be caused to engage in a commercial sex act all in violation of Title 18, United States Code, Sections 1951(a)(1) and 2.

I further believe that probable cause exists to conclude that on or about February 22, 2015, **GORHAM** and **YOUNG**, in at least two federal districts, including the District of Massachusetts, did knowingly transport Minor A, who was under the age of eighteen, in interstate commerce from Maine to Massachusetts with the intent that Minor A engage in prostitution and in sexual activity for which any person can be charged with a criminal offense in violation of Title 18, United States Code, Section 2423.

_____
J. Brooks Broadus
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this **Apr 29, 2015** day of April 2015.

_____
Judith G, Dein
United States Magistrate Judge
District of Massachusetts
Boston, Massachusetts